# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE DIVISION

| | | |
|---|---|---|
| ALEXIS BOURGEOIS | * | CIVIL ACTION NO. 13-0496 |
| VERSUS | * | JUDGE HAIK |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993.  Alexis Bourgeois, born October 3, 1982, filed applications for a period of disability, disability insurance benefits and supplemental security income on April 16, 2010, alleging disability as of April 3, 2010, due to a compressed back fracture, traumatic brain injury, depression and anxiety.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's decision of non-disability.

In fulfillment of Fed. R. Civ. P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability are not supported by substantial

evidence, based on the following:

**(1) Records from Kelly Ray, Ph.D., dated October 15, 2010**.  Dr. Ray found that claimant had moderate restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace.  (Tr. 51).  She had no repeated episodes of decompensation.  She did not meet the criteria for a mental impairment under the Social Security listings.

In the Mental Residual Functional Capacity Assessment, Dr. Ray found that claimant had no understanding and memory limitations; had sustained concentration and persistence limitations, and was moderately limited as to her ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them, and to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 53-54).  Dr. Ray determined that socially, claimant was moderately limited as to her ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors,

and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 54).

**(2) Residual Functional Capacity ("RFC") Assessment by Dr. Charles Lee dated August 31, 2010**.  Dr. Lee determined that claimant could lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk and sit about six hours in an eight-hour workday, and had unlimited push/pull ability.  (Tr. 52).  He found that claimant could climb ramps/stairs frequently; never climb ladders, ropes, or scaffolds; could frequently balance and could occasionally stoop, kneel, crouch, and crawl.  (Tr. 52-53).  She had no manipulative, visual, communicative, or environmental limitations.  (Tr. 53).  He found that she had a light RFC.  (Tr. 249).

**(3) Consultative Examination by Dr. Adeboye A. Francis dated August 17, 2010**.  Claimant complained of a compressed back fracture and closed frontal contusion after an automobile accident in December, 2002.  (Tr. 243).  She reported that her back pain was constant, radiated down her right lower extremities, and was aggravated by driving long distances and walking or sitting for too long.  She also reported recurrent epigastric and burning in the chest, but had never been evaluated for heart burn.

Claimant's medications included Motrin and Fluoxetine.  She had smoked one-half pack of cigarettes per day for 11 years.  (Tr. 244).  She denied drinking alcohol and using illicit drugs.

On examination, claimant was 5 feet 8 inches tall and weighed 199 pounds. She had normal back curvature, unrestricted spine movement, and normal gait and coordination.  (Tr. 245, 246).  Straight leg raising was negative.  (Tr. 245). Claimant could stand/walk on her heels and toes.

Mentally, claimant was lucid and oriented in all spheres.  She had no memory or speech abnormalities.  Thought contents were within normal limits.

Claimant had normal light touch, pinprick, temperature, vibration, and joint position senses.  She had no atrophy or fasciculations, normal muscle tone and strength, and good grasp and grip strengths.  Deep tendon reflexes were 2+ and symmetrical.

X-rays revealed mild thoracolumbar scoliosis, mild DJD, no sublaxation, and no acute fracture.

Dr. Francis' impression was traumatic back pain, for which he recommended pain management; a stable frontal head contusion, and morbid obesity, for which he suggested behavioral modification as well as a weight losing exercise program.

4

## (4) Consultative Examination by Dr. Alan L. Taylor and Associates

## dated August 25, 2010.  Claimant was very agitated upon entrance into the office

and was very hostile with the examiner.  (Tr. 251).  She exhibited common

symptoms/signs of someone with a frontal lobe head injury.  (Tr. 253).  Her

judgment was considered poor.

Dr. Taylor opined that claimant had the ability to understand, remember,

and carry out instructions at a simple level.  However, he noted that she would

experience difficulties understanding and carrying out more complex directions.

He stated that she was capable of managing her personal financial affairs, but due

to poor impulse control and judgment, admittedly overspent.

The assessment results suggested that claimant had an impairment in her

concentration and attention abilities which would interfere with sustaining at least

two hours of repetitive tasks.  She would experience difficulties responding

appropriately to supervision and interacting appropriately with co-workers as per

her difficulties controlling her temper and irritability.  Her pattern of inconsistency

would likely continue and be a significant barrier to her maintaining employment.

He concluded that vocational rehabilitation was still a good option for her if she

was to follow through; however, her ability to work a 40-hour work week was still

questionable.

5

The diagnostic impressions were cognitive disorder, not otherwise specified
("NOS"); mood disorder, NOS, with depressive features; anxiety disorder, NOS,
and polysubstance dependence, in doubtful remission.  Her Global Assessment of
Functioning ("GAF") score was 45.  (Tr. 254).

**(5) Records from Dr. Shawn Hall dated February 22, 2010**.  Claimant
complained of moderate-severe low back pain for one week.  (Tr. 264).  The
impression was thoracic back pain.  She was prescribed Percocet.

**(6) Records from Neuromedical Center dated July 9, 2008 to December
29, 2010**.  On July 9, 2008, John Bolter, Ph.D.'s diagnosis was cognitive
impairment secondary to a traumatic brain injury.  (Tr. 283).

On July 17, 2008, claimant complained of mid-thoracic and upper back
since a motor vehicle accident in 2003.  (Tr. 280).  Her history was significant for
traumatic brain injury, pelvic fracture, and thoracic compression fractures.  (Tr.
281).  She drank alcohol occasionally, and had no problems with drug or alcohol
dependency.  Her mood/affect was pleasant and appropriate.  Attention span,
concentration, general fund of knowledge, and recent and remote memory were
normal.

On back examination, claimant had full forward lumbar flexion and
extension.  Lumbar lordosis was normal, and thoracic kyphosis was slightly

6

decreased.

On motor exam, claimant had no pronator drift in the upper extremities. Her strength was normal.  She could walk on toes and heels without difficulty. She had no atrophy or fasciculations.  Tone was normal.

Sensory examination was normal.  (Tr. 282).  Knee and ankle jerks were 2+ and symmetrical.  Coordination was normal.  Gait and heel to toe walking were normal.

X-rays of the thoracic spine showed old compression fractures of T5, T9, and T11 with an increase in the thoracic scoliosis convexity to the right apex at the T5-6 level compared to the 1/12/2004 films.

The impression was thoracic back pain, a history of thoracic compression fractures, and thoracic scoliosis.  (Tr. 282).  Dr. Scott Nyboer prescribed physical therapy and Flexeril.

On August 21, 2008, claimant stated that she had fallen on her right wrist two weeks prior.  (Tr. 278).  She reported that she could not go to physical therapy because she had an opportunity to go to Gulf Shores, and did not have the time to fit PT into her schedule.  Additionally, she reported that she had been utilizing the Flexeril sporadically.

During the examination, claimant was excessively active.  Extremities demonstrated full active range of motion.  She was wearing a right wrist brace and reported that her wrist was swollen, but he noticed no appreciable swelling.  She had full active range of motion in all fingers, wrist, and lower extremities.  Straight leg raise exam was negative.  Deep tendon reflexes were 1+.

Dr. Nyboer's impression was thoracic back, limb, and right wrist pain.  He encouraged claimant to continue with physical exercise and to be active.  (Tr. 279).

On October 9, 2008, claimant's depression had increased.  (Tr. 277).  Dr. Bolter recommended increasing her Prozac to 40 mg a day and returning to therapy.

On January 19, 2009, claimant complained of severe low back and mid-thoracic pain.  (Tr. 276).  She was taking Tramadol 50 mg. four times a day, Lyrica 75 mg. twice daily and Percocet three times daily for pain relief.  On examination, her strength was 5/5 in the lower extremities, and reflexes were 2+ and symmetrical.

Dr. Nyboer's impression was history of a T9 compression fracture and thoracic back pain.

8

On January 22, 2009, claimant indicated that she had discontinued marijuana and alcohol consumption one month prior.  (Tr. 275).  Dr. Bolter really did not see her as clinically depressed.  He noted that she had done well on Prozac. He discussed looking at various potential job training-type of opportunities.

Dr. Bolter re-enforced that claimant not use any form of alcohol or marijuana.  She agreed with that plan.

On February 12, 2009, claimant's MRI showed stable appearance of claimant's compression fractures at T5, T9, and T11 with some anterior wedging of the T9 fracture.  (Tr. 274).  She continued to have significant thoracic back pain.  She was taking Tramadol 50 mg and Percocet occasionally for severe pain. Dr. Nyboer recommended physical therapy.

On March 5, 2009, claimant maintained that she was no longer using any drugs or alcohol.  (Tr. 272).  She remained on Fluoxetine for depression without any untoward side effects.  She was in therapy for her ongoing behavioral control issue.  (Tr. 273).

Dr. Bolter's impression was cognitive disorder secondary to traumatic brain injury, personality change secondary to traumatic brain injury, labile type.  Her GAF was 60.  He recommended continuing Fluoxetine and therapy.

9

On September 10, 2009, claimant reported that she had had a major automobile accident that was drinking-related, a recent DWI, and a fight that ultimately landed her in jail.  (Tr. 240).  She had also been engaging in excessive alcohol use and some marijuana smoking .

Dr. Bolter recommended that she get into a very intensive treatment center. He noted that she had not been taking her Fluoxetine regularly, which he thought was a mistake for her at that juncture.  (Tr. 271)

On December 29, 2010, claimant had been maintained on Fluoxetine for the past year and a half, and felt that it controlled her mood.  (Tr. 270).  She was not engaging in any inappropriate behavior.  She had also controlled her alcohol consumption and rarely drank at that point.  She was to return every three months.

**(7) Records from St. Elizabeth Physicians dated April 28, 2004 to March 24, 2011**.  An MRI dated April 28, 2004, showed thoracic spondylosis and multiple old, partial compression fractures.  (Tr. 307).  A lumbar MRI dated April 28, 2004, was normal.  (Tr. 306).

A lumbar MRI dated December 9, 2008, showed small Tarlov perineural cysts bilaterally at the S2 level, but was otherwise negative.  (Tr. 304).  X-rays taken on January 23, 2009, showed compression fractures at T5, T9, and T11 with a mild scoliosis and no significant interval change.  (Tr. 303).  A thoracic MRI

dated January 23, 2009, showed that her compression fracture of T5, T9, and T11
was stable with no evidence of canal impingement.  (Tr. 302).

On November 21, 2010, claimant tripped and fell on her left arm.  (Tr. 296).
She admitted to smoking about two packs per week and to social alcohol intake.
She denied any illicit drug use.

The assessment left distal radius fracture/strain.  (Tr. 297).  Dr. Scott Petrie
performed an open reduction internal fixation of the left distal radius on
November 30, 2010.  (Tr. 293-95).

On January 11, 2011, claimant complained of severe back pain.  (Tr. 290).
The impression was chronic pain.  She was prescribed Percocet.

**(8) Records from Dr. Sandra Weitz dated January 27, 2008 to August
19, 2009**.  Plaintiff was seen at Comprehensive Pain Management for mid-low to
upper back pain.  (Tr. 310-42).  On August 3, 3009, claimant was doing better.
(Tr. 312).  Her medications included Ultram ER, Lyrica, Motrin, and Percocet.
(Tr. 311).

**(9) Report from Dr. John Bolter dated August 2, 2011**.  Dr. Bolter stated
that claimant was status-post traumatic brain injury secondary to a motor vehicle
accident in 2003.  (Tr. 360).  He noted that in additional to physician injuries
sustained, including post-compression fractures at T5, T9 and T11 with anterior

11

wedging, she had continued with increasing depression and anxiety for which she was prescribed Fluoxetine.  Her associated documented symptomatology had included loss of interest/anhedonia and behavioral difficulties causing altercations with others, for which continuing therapy had been recommended.  Her assessment included cognitive disorder secondary to traumatic brain injury, personality change secondary to traumatic brain injury, and status-post severe closed head injury.

Dr. Bolter opined that claimant was best maintained in significantly part-time work where she had a great deal of one-on-one supervision and/or job coaching to keep her on task, due to significant distractability problems.  He concluded that any return to work even approaching full-time and competitive employment would not be recommended, as it would likely lead to confrontation with co-employees, supervisors and the public at large.

**(10) Claimant's Administrative Hearing Testimony**.[1]  At the hearing on July 8, 2011, claimant was 28 years old.  (Tr. 16).  She testified that she was 5 feet eight inches tall, and weighed 182 pounds.  She had a driver's license.

---

[1]Claimant's mother, Jan Wood, also testified and confirmed claimant's testimony regarding her agitation, frustration, depression, memory problems, and back pain.  (Tr. 39-41).

Claimant testified that she saw Dr. Bolter every six months.  (Tr. 17).  Her medications included Fluoxetine, Ibuprofen, Oxycodone, and Motrin, from which she reported no side effects.  She complained of back pain with tingling in her thigh and feet, short-term memory problems, frustration, inability to concentrate, and anxiety and depression.  (Tr. 17-18).

As to activities, claimant reported that she was able to dress and bathe herself without assistance.  (Tr. 19).  She could do things around the house, like laundry and dishes, but could not stand at the sink too long because of lower back pain.  (Tr. 20).  She stated that she wore a back brace occasionally.

Claimant graduated from high school and had an associate's degree in general studies.  (Tr. 20-21).  She had last worked in concessions on the weekends in 2010.  (Tr. 21).  She reported that she had quit because she became too tired. (Tr. 24).

Additionally, claimant had worked at a day care center and seafood salesperson.  (Tr. 22).  She had also been a waitress.

Claimant testified that she had lost jobs and friends because of her mental problems.  (Tr. 25-26).  She reported that she had difficulties with responding to supervisors and interacting with co-workers.  (Tr. 30).  She stated that she had been to anger management classes.  (Tr. 32).

13

As to restrictions, claimant stated that she could walk about 50 yards before taking a break.  She reported that she could lift about 25 pounds.  (Tr. 23).  She said that she could sit and stand for 10 to 15 minutes before having to change positions.

Claimant testified that she had gone into substance abuse treatment in 2006 after her accident.  (Tr. 27-28).  She said that she had remained sober for two years.  (Tr. 28).  She stated that she still drank three to four beers on the weekends and smoked marijuana about once a week.  (Tr. 27, 29).

**(11) Administrative Hearing Testimony of Thomas G. Mungall, III, Vocational Expert ("VE")**.  Mr. Mungall classified claimant's past work as a food sales representative as light with a Specific Vocational Preparation ("SVP") of 5, nursery school attendant as light with an SVP of 4, stock clerk as heavy with an SVP of 4, restaurant hostess as light with an SVP of 6, and waitress as light with an SVP of 4.  (Tr. 34-35).

The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education and work experience; who was limited to light work, which was the ability to lift only 20 pounds occasionally, lift and carry only 10 pounds frequently, stand and walk for only six hours out of eight, and sit for six hours out of eight with normal breaks; would need work which was limited to

14

simple, routine, repetitive tasks with one- or two-step instructions in a work environment free of any fast-paced production requirements and involving only simple work-related decisions with few, if any, work place changes, and would have only occasional interaction with the public and/or co-workers.  (Tr. 35).  In response, Mr. Mungall testified that claimant could not return to her past work, but could work as a housekeeping/cleaner, of which there were 915,890 jobs nationally and 14,460 statewide.  (Tr. 35-36).

When the ALJ changed the hypothetical to add the inability to engage in sustained work activity for a full eight-hour workday on a regular and sustained basis, the VE stated that there were no jobs that such a person could perform.  (Tr. 36).

**(12) The ALJ's Findings**.  Claimant argues that: (1) the ALJ improperly rejected the restrictions assessed by her treating doctor without good cause; (2) The ALJ did not comply with 20 C.F.R. §§ 404.1527 and 416.927 in failing to articulate good reasons to reject the treating physician's opinion; (3) the ALJ's RFC finding is not supported by the evidence, and (4) the ALJ's finding that she could do other jobs besides her past work is unsupported.  Because I find that the ALJ failed to properly evaluate the opinions of claimant's treating physician, as

well as her RFC, I recommend that this matter be **REVERSED**, and that claimant be awarded benefits.

Regarding the first two arguments, it is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).

A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with  . . .  other substantial evidence." *Newton*, 209 F.3d at 455.

Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence. *Id.*; *Greenspan*, 38 F.3d at 237.

Here, claimant argues that the ALJ failed to properly evaluate Dr. Bolter's treating source opinion in accordance with Social Security Ruling ("SSR") 96-2p, 20 C.F.R. §§ 404.1527 and 416.927, and *Newton*, *supra*.

16

In *Newton*, the Fifth Circuit set forth the factors to be considered before declining to give the treating physician's opinion controlling weight. Specifically, 20 C.F.R. § 404.1527(c) requires consideration of: (1) the physician's length of treatment of the claimant, (2) the physician's frequency of examination, (3) the nature and extent of the treatment relationship, (4) the support of the physician's opinion afforded by the medical evidence of record, (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. *Id*. at 456.

This regulation is construed in SSR 96-2p, which states:

[A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

The ALJ noted that he had the considered the opinion evidence in accordance with the requirements of §§ 404.1527 and 416.927, SSR 96-2p, 96-5p, 96-6p, and 06-3p. (Tr. 77). He cited Dr. Bolter's opinion that claimant should avoid full-time competitive work. (Tr. 79). However, he afforded little weight to

this opinion, noting that "findings of disability or inability to sustain full-time work are determinations specifically reserved to the Commissioner.  *See Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) ("[a]mong the opinions by treating doctors that have no special significance are determinations that an applicant is 'disabled' or 'unable to work.'  20 C.F.R. § (3)(1).  These determinations are legal conclusions that the regulation describes as 'reserved to the Commissioner.'").

In this case, however, the ALJ failed to evaluate the elements for discounting the treating physician's opinions as required by the Fifth Circuit. *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (*citing Newton*, 209 F.3d at 456). In *Myers*, the court reiterated *Newton's* holding that an ALJ must consider the following factors before declining to give controlling weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization.  *Id*. at 621 (*citing Newton,* 209 F.3d at 456).

Here, the ALJ failed to apply these factors to the opinions of claimant's treating physician, Dr. Bolter.  In his report dated August 2, 2011, Dr. Bolter opined that claimant was best maintained in significantly part-time work where she had a great deal of one-on-one supervision and/or job coaching to keep her on task, due to significant distractability problems.  He concluded that any return to

18

work even approaching full-time and competitive employment would not be recommended, as it would likely lead to confrontation with co-employees, supervisors and the public at large.

This opinion is controlling in this case. Dr. Bolter saw claimant about every six months and had been treating claimant since 2008. Bolter apparently specializes in traumatic brain injury such as that sustained by claimant. The deficits that Dr. Bolter identified, and which he felt made claimant unable to work in a full-time competitive work setting, are consistent with a frontal lobe organic brain injury which claimant unquestionably had sustained. Accordingly, Dr. Bolter's opinion is entitled to controlling weight in this case.  *Id.*

A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time." *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002) (*citing Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)).  Further, the ability to work only a few hours a day or to work only on an unpredictable or intermittent basis does not constitute the ability to engage in "substantial gainful activity."  *Tucker v. Schweiker*, 650 F.2d 62, 64 (5th Cir. 1982); *Cornett v. Califano*, 590 F.2d 91, 94 (4th Cir. 1978);

*Prestigiacomo v. Celebrezze*, 234 F.Supp. 999 (E.D. La. 1964).

Here, the ALJ erred in failing to determine whether claimant was capable not only of obtaining employment, but also maintaining it.  *Watson*, 288 F.3d at 218.  Claimant's treating physician, Dr. Bolter, specifically determined that claimant was unable to work full-time due to her cognitive disorder.  In giving this opinion "little weight," the ALJ ALJ failed to address the factors in *Myers* and *Newton*.  (Tr. 79).  Thus, the ALJ erred.

Accordingly, the undersigned recommends that this case be **REVERSED**, and that claimant be awarded benefits as of April 16, 2010.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

## FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND

**RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

July 30, 2014, at Lafayette, Louisiana.

C. Michael Hill

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

Copy sent:  RTH
On: 7/30/2014
by:  MBD

21